STATE of Minnesota, Respondent,

v.

David Allen CARLSON, Appellant.

No. 47713.

Supreme Court of Minnesota.

May 26, 1978.

Rehearing Denied July 12, 1978.

Phillip S. Resnick, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., St. Paul, Robert W. Johnson, County Atty., Edwin M. Wistrand, Asst. County Atty., Anoka, for respondent.

Heard before ROGOSHESKE, TODD, and YETKA, JJ., and considered and decided by the court en banc.

TODD, Justice.

A 12-year-old girl was brutally murdered. She had last been seen in the company of defendant, David Carlson, and another male. As part of their investigation, the police interviewed Carlson at his home. During the questioning, Carlson's evasive answers concerning the origin of a dark-colored stain on his jacket aroused the suspicions of the investigators. When Carlson refused to voluntarily accompany the officers to the police station, he was placed under arrest. Subsequent testing of hair and blood samples linked Carlson to the scene of the killing. Carlson's objection to the introduction of expert testimony concerning these tests was overruled. The jury found Carlson guilty of first-degree murder. We affirm.

On Saturday, March 20, 1976, the body of a 12-year-old girl was found in a wooded area of Anoka County. The body was almost nude, the face was battered in, and the upper portion of the body was covered with bruises and abrasions. Officers investigating the scene of the crime found two foreign pubic hairs stuck to the skin of the deceased in the groin area. Head hairs were found clutched in the victim's hand. The position of the hairs was photographed and the hairs were removed for examination. A small plastic bag containing a quantity of petroleum jelly was also found at the scene.

Later in the day, an autopsy was performed on the body. The examiner was unable to determine whether the victim had been sexually molested. He did find two stains in the groin area which appeared to be petroleum jelly. He also obtained samples of the victim's blood, head hair, and pubic hair. Because the victim's body had been subject to adverse climatic conditions, the examiner was unable to make a reliable estimate of the time of death.

The victim was reported missing by her mother on Friday, March 19, 1976. The mother last saw her daughter on Thursday evening, March 18, when she dropped the girl off at a restaurant at about 6:40 p. m. She last spoke to her daughter on the phone at home 1 hour later. Carlson and his friend called at the victim's home to visit her brother at about 9:15 p. m. on Thursday

evening. Carlson's friend told the police that the victim and her sister were at home and that the sister left during their visit. Carlson and his friend left the victim's home alone at about 9:30 p. m. and parted company.

As part of the investigation, two police officers contacted Carlson at his house late in the day on which the body was discovered. Carlson's responses to the officers' questions were guarded and ambiguous. As they were talking, one investigator observed a "dark smear" on the front of the nylon jacket that Carlson was wearing. Carlson's explanations were implausible and sufficiently suspicious to prompt one of the investigators to telephone his superior. He was instructed to bring in Carlson, under arrest if necessary. The officers then requested Carlson to accompany them to the sheriff's office so that the smears on the jacket could be tested. Carlson adamantly refused and was promptly placed under arrest.

After his arrival at the sheriff's office, Carlson was given a *Miranda* warning. He waived his rights and voluntarily talked to the police, maintaining his story that the stain on his jacket was caused by ketchup. A test was performed and Carlson was advised that the stain was blood. He then told the officers that his dog had been killed and he had carried it, spilling blood on himself in the process. When one of the officers recalled having seen a healthy dog at his residence, Carlson replied that the dog had not actually·been killed, but only injured. No additional conversations of any significance were had between Carlson and law enforcement officials on that evening.

After Carlson was questioned, a search warrant was obtained. Pursuant to his warrant, the police obtained samples of Carlson's blood, saliva, head hair, and pubic hair. The police also searched his home, finding an empty petroleum jelly jar, a spot

of blood in his bedroom, and a shoe polish rag to which a strand of hair had clung.

All of the physical evidence obtained from the victim, from the scene of the crime, from Carlson, and from his place of residence was submitted to the Bureau of Criminal Apprehension (BCA) for analysis.

At trial, the state called Mary Ann Strauss, the BCA laboratory analyst who had examined the physical evidence gathered by the police. She testified that the blood from the stain on Carlson's jacket possessed ABO, PGM, and EAP characteristics identical to the victim's blood and that it had been necessary to run the blood test twice to ensure the reliability of the results.[1] Strauss also stated that less than 1 percent of the population would have blood with the same combination of characteristics as that of the murder victim.[2]

The blood testing completely consumed the stain from Carlson's jacket. Carlson was not given notice of this fact, but there is no evidence that the tests were conducted in a manner expressly calculated to exhaust the available evidence.

Strauss also conducted a microscopic comparison of the foreign hairs found on the victim with hairs taken from Carlson's person. She testified that Carlson's pubic hair was similar to the two pubic hairs found stuck to the victim in all 15 categories of microscopic comparison. Foreign head hairs found on the victim were likewise compared to Carlson's and also proved to be similar in all 15 typing characteristics. Finally, the head hair found in Carlson's bedroom on the shoe polish rag was similar to the victim's hair in all 15 categories. All of the hairs tested were found to be dissimilar to the hair of the male who had accompanied Carlson to the victim's home on Thursday evening, March 18.

The state also called a second expert on comparative microscopy, Barry Gaudette of

---

1. Strauss also tested the spot of blood found in Carlson's bedroom. Although it proved to be too small to allow complete classification, the spot was of the same ABO type as the victim's blood.

2. The figure quoted by Strauss was derived from BCA statistics which were in turn correlated with national and international blood-type records. See, *People v. Gillespie*, 24 Ill.App.3d 567, 321 N.E.2d 398 (1974).

the Royal Canadian Mounted Police. Gaudette conducted the same comparisons made by Strauss, utilizing 26, rather than 15, categories of comparison. His results were the same as Strauss'. The hairs compared were found to be similar in all 26 characteristics and dissimilar in none. Gaudette also testified that based on his own scientific studies,[3] there was a 1-in-800 chance that the pubic hairs stuck to the victim were not Carlson's and a 1-in-4,500· chance that the head hairs found on the victim were not Carlson's.

Defense counsel objected to the testimony of each of the state's experts, but the trial court allowed all three to testify. Carlson did not take the stand on his own behalf. The jury returned a verdict of guilty of murder in the first degree, and the trial court imposed the mandatory life sentence.

Carlson raises the following issues on this appeal:

(1) Was a *Miranda* warning required when the police officers' suspicion began to focus on Carlson during the questioning at his home?

(2) Was there probable cause for Carlson's arrest?

(3) Are the results of a blood analysis admissible when the testing procedure completely exhausts the available sample?

(4) May expert witnesses express their findings in terms of mathematical probabilities?

(5) Were the remarks of the prosecutor in his closing argument constitutionally improper and inflammatory?

1. The evidence seems clear that when the police investigators went to Carlson's house to question him concerning his contact with the victim, the police had focused no suspicion upon Carlson whatsoever. At that time, the officers had already talked to Carlson's friend, obtained a statement from him, and departed. A similar interview was no doubt anticipated with Carlson. As the conversation developed, however, Carl-

son's improbable explanation for the stain on his jacket did cause the officers to focus upon him as a possible suspect. In site of the rapidly developing suspicion, Carlson was not given a *Miranda* warning until after he had been placed under arrest and had been taken to the police station.

■ On appeal, Carlson argues that he was entitled to a *Miranda* warning when the suspicion of the investigating officers began to focus on him. In light of this court's recent decision in *State v. Ousley*, Minn., 254 N.W.2d 73, 74 (1977), Carlson's position is without merit:

" * * * [T]he test in determining the need for a *Miranda* warning is not whether the interrogation has coercive aspects to it or whether the person being interrogated is a suspect, but whether the person is in custody or otherwise deprived of his freedom of action in any significant way. Here, *defendant was not in custody nor was her freedom of action restricted in any significant way when the investigating officer questioned her at home.*" (Italics supplied.)

Precisely the same can be said in this case. Carlson was questioned in his home and was in no meaningful sense deprived of his freedom when the questioning occurred.

2. Carlson next argues that even if a *Miranda* warning was not required at some point during his conversation with the police investigators, the officers had no authority to place him under arrest because probable cause for an arrest did not exist at that time. Were this contention correct, the exclusionary rule would render inadmissible, as the product of an illegal arrest, the physical evidence subsequently taken from Carlson's person at the police station.

■ The test for evaluating probable cause when the legality of an arrest is challenged is familiar. Probable cause exists where the facts would lead a person of ordinary care and prudence to entertain an honest and strong suspicion that the person under consideration is guilty of a crime. Each case must be determined on its own

---

**3.** A third expert witness testified to the methodological validity of Gaudette's studies.

facts and circumstances, and the facts present must justify more than mere suspicion but less than a conviction. In applying this test, a court should not be unduly technical and should view the circumstances in light of the whole of the arresting officer's police experience as of the time of the arrest. See, e. g., *State v. Cox*, 294 Minn. 252, 200 N.W.2d 305 (1972); *State v. Bean*, 280 Minn. 35, 157 N.W.2d 736 (1968); *State v. Fish*, 280 Minn. 163, 159 N.W.2d 786 (1968); *State v. Harris*, 265 Minn. 260, 121 N.W.2d 327, certiorari denied, 375 U.S. 867, 84 S.Ct. 141, 11 L.Ed.2d 94 (1963). While the question of probable cause is a close one in this case, we have carefully reviewed the record and conclude that there was sufficient probable cause to justify Carlson's arrest.

3. It is undisputed that the bloodstain on Carlson's jacket was a small one and was entirely consumed in the testing procedures at the BCA crime laboratory. Carlson argues that the laboratory analysis deprived him of the opportunity to examine the evidence against him and therefore denied him due process of law. We have reviewed the cases cited by Carlson in support of his position and find that they do not impel us to the conclusion he suggests. While the question is one of first impression in Minnesota, we note that other courts have drawn a sharp distinction between intentional destruction of evidence by the state and situations in which it is for some reason not possible for the state to retain the physical evidence for trial.

For example, in *People v. Taylor*, 54 Ill. App.3d 454, 12 Ill.Dec. 76, 369 N.E.2d 573 (1977), the state in good faith destroyed incriminating evidence which would otherwise have been available to the defendant for independent chemical analysis. The court reversed the conviction, but noted (54 Ill.App.3d 457, 12 Ill.Dec. 79, 369 N.E.2d 576):

"  *  *  *  [W]henever an accused seeks by timely motion a sample of the allegedly controlled substance, so that it can be subjected to independent testing *  *  *, a heavy burden devolves upon the State either to produce a testable sample *or to prove by clear and convincing evidence that the destruction of all of the substance in its possession was necessary.* *  *  * As the *destruction here was clearly unnecessary,* the State's expert testimony should not have been admitted, and defendant's conviction must be reversed *  *  *." (Italics supplied.)

Other decisions include a similar caveat for circumstances under which the elimination of testable evidence is necessary. In *State v. Hitch*, 113 Cal.Rptr. 158, 161, 520 P.2d 974, 977 (1974), the court said:

" *  *  * [O]nce a showing has been made that it is reasonably possible that evidence with respect to the test could assist the defense, due process requires that it be produced or the results of the test suppressed, *unless it is shown that the items which were destroyed could not have been preserved without unreasonable effort.*" (Italics supplied.)

The court in *State v. Wright*, 87 Wash.2d 783, 791, 557 P.2d 1, 6 (1976), observed:

"While good faith *loss* may excuse noncompliance with the duties of preservation and disclosure where the government makes 'earnest efforts' to preserve crucial materials, *  *  * this is not such a case. As previously noted, there is no suggestion that the evidence was destroyed for the purpose of hindering the defense. However, in destruction of evidence cases, as in true suppression cases to which they are closely analogous, the motive of those destroying the items is not determinative. *  *  * Here the destruction was intentional; no efforts were made to preserve the evidence.* *  *  * However, neither administrative convenience nor inadequate facilities, where it is not shown facilities could not be obtained, justifies a failure to preserve potential evidence.*" (Italics supplied in part.)

Accord, *Lauderdale v. State*, 548 P.2d 376 (Alaska 1976).

In *Lee v. State*, 511 P.2d 1076, 1077 (Alaska 1973), the Alaska Supreme Court squarely held that chemical analysis which ex-

hausts the supply of the incriminating substance does not bar the prosecution from introducing the results of the analysis against the defendant at trial:

> "We find that due process of law does not require that the defendant be permitted independent expert examination of evidence in the possession of the prosecution before such evidence is introduced at the trial.  *  *  *  In those cases where expert analysis exhausts the substance there is clearly no error in the admission of evidence regarding the analysis in the absence of allegations and proof of deliberate destruction, or deliberate attempts to avoid discovery of evidence beneficial to the defense."

█ We are in agreement with the Alaska court. Due process does not require that criminal conduct go unpunished simply because the perpetrator leaves only a small sample of incriminating evidence behind. In this case, the testimony of Strauss clearly indicates that it was absolutely necessary to exhaust the entire bloodstain in order to procure a reliable test result. Moreover, Carlson does not suggest, and there is no evidence in the record, that the exhaustion of the bloodstain was accomplished in bad faith by state personnel. For these reasons, we conclude that Carlson's due process rights were not violated by the introduction of the results of the bloodstain analysis.[4]

4. As previously discussed, two of the state's expert witnesses at trial testified concerning the results of scientific testing involving physical evidence discovered by police investigators. Certain of this testimony was couched in numerical or statistical terms, and Carlson asserts that its admission was erroneous. Specifically, Strauss stated that only .85 percent of the population would have blood with the same combination of ABO, PGM, and EAP characteristics as the victim's blood and the matching bloodstain found on Carlson's jacket. Gaudette testified that based on his studies there was a 1-in-800 chance that the

foreign pubic hairs found on the victim were not Carlson's and a 1-in-4,500 chance that the head hairs found clutched in the victim's hand were not Carlson's.

Carlson argues that the expert testimony should not have gone beyond the point of stating that the blood and hair found on or about Carlson was similar to that of the victim. To express this similarity in mathematical terms, it is urged, goes one step too far toward an ultimate conclusion of fact and therefore invades the province of the jury. In his brief, Carlson cites several cases as support for the proposition that evidence in a criminal trial may not be expressed in the form of statistical probabilities. See, *People v. Collins*, 43 Mich. App. 259, 204 N.W.2d 290 (1972); *People v. Collins*, 68 Cal.2d 319, 66 Cal.Rptr. 497, 438 P.2d 33 (1968); *State v. Sneed*, 76 N.Mex. 349, 414 P.2d 858 (1966); *Miller v. State*, 240 Ark. 340, 399 S.W.2d 268 (1966).

The cases cited, however, do not fairly establish so broad a prohibition. The Michigan case of *People v. Collins, supra*, is simply inapposite here. The expert's testimony on statistical probability in that case was based in part on the opinion of another expert. Under Michigan law, one expert witness may not base his own testimony on the opinion of another expert witness. The Michigan court was thus able to find error in the admission of the statistical data without coming to grips with the merits of probability testimony in general.

The use of statistical probability testimony in the remaining three cases suffered from a fundamental deficiency. In each case, the data upon which the probability calculations were based was wholly without foundation. Instead of relying on empirical data collected in the course of a scientific study, the experts in those cases merely *estimated* the frequency of occurrence of certain characteristics and based their probability projections on these estimates. And it was precisely this lack of demonstrable foundation to which the courts objected in

---

4. We do observe, however, that when chemical analysis may require the total exhaustion of the available physical evidence, better practice would dictate that the defendant be notified of the proposed testing so that the defendant's own expert can be present, if so desired.

*People v. Collins* (California), *supra* ; *State v. Sneed, supra* ; and *Miller v. State, supra.* The New Mexico court in *Sneed* said (76 N.Mex. 354, 414 P.2d 862):

"We hold that mathematical odds are not admissible as evidence to identify a defendant in a criminal proceeding *so long as the odds are based on estimates, the validity of which have not been demonstrated.*" (Italics supplied.)

Similarly, the Arkansas court in *Miller* said (240 Ark. 343, 399 S.W.2d 270):

" * * * [The expert witness] had made no tests on which he could reasonably base his probabilities of one in ten on soil color, one in one hundred on soil texture, or one in one thousand on soil density (which he multiplied together to obtain his one-in-one-million figure), nor did he base his testimony on studies of such tests made by others. *He admitted that his figures were predicated on 'estimates' and 'assumptions.' In short, there is no foundation upon which to base his probabilities of one in a million.*

\* \* \* \* \* \*

"Admission of the unsubstantial, speculative testimony on probabilities was clearly erroneous." (Italics supplied.)

In contrast, the foundation for the experts' testimony in the present case was properly laid, based upon empirical scientific data of unquestioned validity.

Our concern over this evidence is not with the adequacy of its foundation, but rather with its potentially exaggerated impact on the trier of fact. Testimony expressing opinions or conclusions in terms of statistical probabilities can make the uncertain seem all but proven, and suggest, by quantification, satisfaction of the requirement that guilt be established "beyond a reasonable doubt." See, Tribe, *Trial by Mathematics*, 84 Harv.L.Rev. 1329. Diligent cross-examination may in some cases minimize statistical manipulation and confine the scope of probability testimony. We are not convinced, however, that such re-

buttal would dispel the psychological impact of the suggestion of mathematical precision, and we share the concern for "the substantial unfairness to a defendant which may result from ill conceived techniques with which the trier of fact is not technically equipped to cope."[5] *People v. Collins*, 68 Cal.2d 332, 66 Cal.Rptr. 505, 438 P.2d 41.

For these reasons, we believe Gaudette's testimony that there was only a 1-in-800 chance that the foreign pubic hairs found on the victim did not come from the accused and an even more remote 1-in-4,500 chance that the head hairs did not belong to the accused was improperly received. Strauss' testimony concerning microscopic hair comparison analysis, however, was properly admitted. In light of Strauss' testimony, we regard Gaudette's statement as cumulative and thus nonprejudicial on the facts of this case.

5. We cannot agree that the allegedly inflammatory remarks contained in the prosecutor's closing argument were so serious as to constitute prosecutorial misconduct requiring reversal of Carlson's conviction. At worst, the prosecutor's argument to the jury fell far short of the impropriety which we found to be grounds for reversal in *State v. Zecher*, 267 Minn. 497, 128 N.W.2d 83 (1964), and *State v. Haney*, 222 Minn. 124, 23 N.W.2d 369 (1946). In accordance with our decision in *State v. Caron*, 300 Minn. 123, 218 N.W.2d 197 (1974), we observe that no objection or request for curative instructions was made by defense counsel. We conclude that the alleged misconduct played no substantial role in bringing about the jury's verdict of guilty.

The judgment of conviction is affirmed.

Affirmed.

---

**5.** In a similar vein, see our discussion of complex expert testimony in *State v. Spencer*, 298 Minn. 456, 216 N.W.2d 131 (1974).