STATE of Minnesota, Appellant,

v.

Juan Lopez ORTIZ, Respondent.

No. C2–00–2188.

Court of Appeals of Minnesota.

May 8, 2001.

Review Denied June 27, 2001.

Mike Hatch, Attorney General, St. Paul, MN; and Craig S. Nelson, Freeborn County Attorney, David J. Walker, Assistant County Attorney, Albert Lea, MN, (for appellant).

Mark D. Nyvold, St. Paul, MN, (for respondent).

Considered and decided by TOUSSAINT, Presiding Judge, AMUNDSON, Judge, and HUSPENI, Judge.*

## OPINION

AMUNDSON, Judge

On appeal from a pretrial order dismissing a first-degree assault count for lack of probable cause, the state argues that the district court erred by requiring the state to establish probable cause by evidence that would be admissible at trial and by rejecting the state's theory that, under the circumstances, respondent's use of his fists could constitute "deadly force."

## FACTS

On August 3, 2000, officers of the Albert Lea Police Department were dispatched to the jail area of the law enforcement center in Albert Lea (the jail) where an assault had allegedly occurred. Responding to the call, Officer Ben Mortensen found Mark Oakland, a correctional employee at the jail, disoriented and lying in a jail cell with his head, hands, and uniform covered in blood coming from a one-and-one-half-inch laceration on the back of Oakland's head. Even when prompted, Oakland was unable to recall how he was injured. An ambulance transferred Oakland to the Albert Lea Medical Center where an emergency room doctor concluded that he had a concussion and possible intra-cranial bleeding. Because of the danger of intra-cranial bleeding, Oakland was flown by helicopter to the Mayo Clinic where he continued to experience trouble with short-term memory. Two days after his admis-

sion, Oakland was released from the hospital. He has never been able to recall the assault.

Detective Spencer Osterberg also responded to the call. He found Juan Lopez Ortiz in the control room of the jail with keys to the jail in hand. At the sight of Osterberg with his weapon drawn, Ortiz dropped the keys and was arrested.

Ortiz is a five-foot, eight-inch, 265-pound former carnival worker. He is a powerfully built man, large enough that, instead of handcuffs, leg restraints had to be used to bind his hands behind his back. In statements made to several law enforcement officers, Ortiz admitted hitting Oakland in an unprovoked attack to avoid returning to prison in Maryland. He stated that he had nothing to lose because he was going away for 75 years. He described hitting Oakland three times and said that, because he knew he was strong, he hoped he did not hurt Oakland too badly. He described his initial blow as so hard that it "scared" him, and he openly speculated that he might have killed Oakland.

Ortiz was charged with assault in the first degree involving the use or attempted use of deadly force on a correctional employee. The investigators interviewed several inmates who witnessed the assault. At the probable cause hearing, Detective Terry Cochran, an investigating officer, testified that Jon Quam, another inmate at the jail, had described the attack to him. According to Quam, Ortiz first struck Oakland "extremely hard" causing Oakland to fall and hit his head on the heavy steel control box, rendering him unconscious. Ortiz continued to strike Oakland several more times in the face while Oakland was lying defenseless on the floor. These

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to

Minn. Const. art. VI, § 10.

blows were sufficiently forceful to cause Oakland's head to bounce on the concrete. Ortiz then pulled Oakland's body partially into a jail cell, with Oakland's head dragging on the floor. While attempting to close the cell door electronically, Ortiz repeatedly closed it on Oakland.

The district court left the court file open so that the state could supply Oakland's medical records. However, after failing to produce those records in a timely fashion, the district court dismissed this count without elaboration, finding that the state had failed to produce sufficient admissible evidence to establish reasonable and probable cause to believe the defendant committed the alleged crime. The state moved the court to reconsider and, as the basis for this reconsideration, attached medical records that had been in transit at the time of the first order. Citing the dangers of forum shopping, a different district court judge denied that request. This appeal followed.

### ISSUES

I.  Where a district court fails to support its conclusions with adequate findings, must this court remand for further findings if there is no conflicting testimony to weigh?

II. Did probable cause exist for the charge of assault in the first degree involving the use or attempted use of deadly force on a correctional employee?

III. Should this court consider portions of the state's brief containing Deputy Oakland's medical records, an amended complaint that was not before the district court, and hearsay evidence by prisoners?

### ANALYSIS

#### I.

██ The district court found that the evidence did not provide probable cause to

support the charge of first-degree assault, but did not make any further findings. In *State v. Kvam*, the supreme court reviewed a case with a similar lack of findings. 336 N.W.2d 525, (Minn.1983). In *Kvam*, the court stated that it would be easier to review the district court's decision if the district court had made findings, noting that one of the main reasons for requiring findings is to make it possible to ascertain from the record the basis for the district court's ruling. *Id.* at 528 (quoting *State v. Rainey*, 303 Minn. 550, 550, 226 N.W.2d 919, 921 (1975)). However, in the interests of judicial economy, the court declined to remand the case for further findings. *Id.* at 529. Despite the fact that there was a factual dispute between the defendant's testimony and the testimony of the officer, the supreme court "reached the firm conviction that it would be a mistake to reject entirely the officer's testimony" and reversed the district court's dismissal of the case. *Id.*

We need not construe *Kvam* to be of broad application to, nevertheless, arrive at a similar conclusion. In *Kvam* there was at least a modicum of conflicting testimony for the court to weigh. Here, there was no conflicting testimony at all. The only testimony before the district court was that of Cochran. Accordingly, we need not remand for clearer findings.

#### II.

██ The state appeals the district court's determination that no probable cause exists. A dismissal for lack of probable cause is appealable if it is based on a legal determination. *State v. Ciurleo*, 471 N.W.2d 119, 121 (Minn.App.1991). As with other legal determinations, it is reviewed de novo. *See State v. Linville*, 598 N.W.2d 1, 2 (Minn.App.1999) (reviewing a

dismissal for lack of probable cause based on statutory interpretation). Here, the facts are largely undisputed. The essential issue then is the application of statutory criteria to those facts, a determination that is also reviewed de novo. *State v. Bunde*, 556 N.W.2d 917, 918 (Minn.App. 1996) (reviewing legality of arrest outside officer's jurisdiction).

■■ Probable cause exists where the facts would lead a person of ordinary care and prudence to hold an honest and strong suspicion that the person under consideration is guilty of a crime. *State v. Carlson*, 267 N.W.2d 170, 173 (Minn.1978). In addressing a probable cause challenge, the court must determine whether, given the facts disclosed by the record, it is fair and reasonable to require the defendant to stand trial. *State v. Florence*, 306 Minn. 442, 457, 239 N.W.2d 892, 902 (1976). That is, whether the facts appearing in the record "would preclude the granting of a motion for a directed verdict of acquittal if proved at trial." *Id.* at 459, 239 N.W.2d at 903.

■■ The question here is whether the evidence produced at the probable cause hearing supports the first-degree assault charge. First-degree assault of a correctional officer is defined as assaulting a peace officer or correctional employee

> by using or attempting to use *deadly force* against the officer or employee while the officer or employee is engaged in the performance of a duty imposed by law, policy, or rule.

Minn.Stat. § 609.221, subd. 2(a) (2000) (emphasis added). Deadly force is defined as

> force which the actor uses with the purpose of causing, or which the actor should reasonably know creates a substantial risk of causing, death or *great bodily harm.*

Minn.Stat. § 609.066, subd. 1 (2000) (emphasis added). Great bodily harm means

> bodily injury which creates a high probability of death, or which causes serious permanent disfigurement, or which causes a permanent or protracted loss or impairment of the function of any bodily member or organ or other serious bodily harm.

Minn.Stat. § 609.02, subd. 8 (2000). There is no requirement that the victim actually suffer great bodily harm. Rather, the force used must be either (1) directed for the purpose of causing great bodily harm or (2) sufficient for the user of force to know he is creating the substantial risk of such harm. *See* Minn.Stat. § 609.066, subd. 1.

■■ Neither this court nor the supreme court has previously determined whether force not including a firearm is "deadly" under Minn.Stat. § 609.066, subd. 1. *Cf. Johnson v. Morris*, 453 N.W.2d 31, 38 (Minn.1990) (holding that intentional discharge of gun toward another is "deadly force"). In trying to establish the perimeter of "deadly force," Ortiz cites to cases discussing whether or not fists can be considered dangerous weapons. *E.g., State v. Basting*, 572 N.W.2d 281, 282 (Minn.1997) (evidence insufficient to support that fists were used as a dangerous weapon); *State v. Davis*, 540 N.W.2d 88, 90 (Minn.App. 1995) (hands and feet were dangerous weapons in assault of pregnant woman). Presumably Ortiz cites these cases because, in assaulting Oakland, Ortiz used no weapons other than his bare hands. Nevertheless, these cases are not applicable because deadly force need not involve a dangerous weapon, or any weapon for that matter. Bare hands, even when not deemed "dangerous weapons," can administer "deadly force" in many situations—for example by choking, pushing a victim

into harm's way, or inflicting a severe beating.

■ Here, the issue is whether the evidence supports a finding that Ortiz used force by which he either intended to, or should reasonably have known would, create either a substantial risk of causing a permanent or protracted loss or impairment of any bodily member or organ, or other serious bodily harm. The evidence before the district court detailed an attack committed by a very strong man punching a correctional employee "extremely hard" in the face; continuing to beat the victim, after he was rendered unconscious, with several undefended blows to the head that were hard enough to cause the victim's head to bounce on the concrete floor; dragging his unconscious victim on his head across the concrete floor; and, finally, closing a cell door on the victim several times. Indeed, the attack even alarmed the attacker and caused him to worry that he had killed his victim. The aftermath of the assault (memory loss) was sufficient to substantiate the conclusion that the assault involved a severe beating. It is for the jury to decide whether these facts, if proven at trial, constitute the use of deadly force.

## III.

### Medical Records

■ Ortiz requests this court to strike the portion of the state's brief containing the medical records of Deputy Oakland. His basis for this motion is Minn.R.Civ. App.P. 110.01, which states that the record on appeal is limited to the papers filed, the exhibits, and the transcript of the proceedings. Ortiz suggests that this action is justified because the district court stated in its memorandum that it was not supplied with the medical records, and there-

fore the information regarding Oakland's injuries came from the briefs alone. Although the medical records did not become available to the state until after the initial district court decision, they were submitted along with the motion to reconsider the omnibus order, the denial of which was also appealed. Accordingly, this information is properly part of the record. Furthermore, we note that the medical records here are only relevant to the extent of Oakland's injuries. As the determination of whether "deadly force" was used is a question of the intent of the actor, and not the extent of the injury, this information is of limited importance.

### Amended Complaint

■ In fashioning several of the facts, most notably the facts regarding Deputy Oakland's injuries, the state used information contained in the unsigned amended complaint that was filed after the initial order. Ortiz has moved to strike this amended complaint. But the medical records account for all of the "new" facts in the amended complaint. As the medical records are appropriately considered part of the record on appeal, these statements and facts are part of the record regardless of the validity of the amended complaint. Furthermore, because the state appeals from the denial of the motion to reconsider as well as the dismissal itself, the amended complaint stands as part of the record.

### Hearsay Evidence

■ Ortiz also suggests that much of the evidence presented to the court was hearsay and therefore should not be considered. But the Minnesota Rules of Criminal Procedure provide that reliable hearsay may be, in whole or in part, the basis for a finding of probable cause.

Minn.R.Crim.P. 11.03.[1] Ortiz suggests that these hearsay statements are not reliable because they were made by anonymous inmates. But, in reality, the most extensive and significant hearsay statement made in the omnibus hearing was in specific reference to John Quam's observations. Clearly, Quam was not anonymous. Furthermore, any other hearsay statements considered were also not anonymous. Ortiz here confuses anonymous individuals with those who are merely unidentified. The testifying deputy conducted interviews of many of the prisoners and, at trial, those prisoners would be expected to testify.

## DECISION

The district court erred by failing to consider reliable hearsay in evaluating probable cause, failing to explain its conclusions with regard to probable cause, and by concluding that probable cause did not exist for a first-degree assault charge when a jury could find that the facts supported the conclusion that deadly force was used in the assault.

**Reversed, motions denied.**

---

1. The district court also appears to have applied the wrong standard when it erroneously found that the state had not produced sufficient *admissible* evidence to establish probable cause. In determining probable cause, the district court may consider evidence in a form that is not necessarily admissible at trial. *See* Minn.R.Crim.P. 11.03 (probable cause determinations are to be based upon the entire record, including reliable hearsay). It is only if the defense presents exonerating evidence that the court must assess, from a record that may include inadmissible evidence, that the prosecutor possesses substantial evidence admissible at trial and sufficient to withstand a motion for a directed verdict of acquittal. *State v. Rud,* 359 N.W.2d 573, 579 (Minn. 1984).