STATE of Minnesota, Respondent,

v.

Timothy Edward CAMPION, Appellant.

No. C5–83–1238.

Court of Appeals of Minnesota.

July 3, 1984.

Hubert H. Humphrey, III, Atty. Gen., Janet A. Newberg, Sp. Asst. Atty. Gen., St. Paul, for respondent.

C. Paul Jones, State Public Defender, Renee J. Bergeron, Asst. State Public Defender, Minneapolis, for appellant.

Considered and decided by SEDGWICK, P.J., PARKER and CRIPPEN, JJ., with oral argument waived.

## OPINION

PARKER, Judge.

Timothy Edward Campion appeals from his conviction, after a trial by jury, for theft by swindle and fraud in the sale of securities. Appellant was involved, in 1981, in six different corporations. Four of them were interlocking companies centered upon First Guaranty Corporation. Appellant was president of two: Investment Sales Diversified (ISD) and Developer's Sales Escrow, Inc. (DSE). He had also served as president of Developer's Sales, Inc. (DSI). The companies acquired mortgages and contracts for deed and sold them at a profit to private investors.

Appellant was convicted of instituting a scheme by which an elderly investor, William Piispanen, was sold a nonexistent mortgage, and of using the $13,922 proceeds for his own personal purposes. He was sentenced on the theft by swindle count to 18 months in the custody of the Commissioner of Corrections, an upward durational departure from the presumptive sentence of one year and one day stayed. Appellant was offered probation but rejected the conditions placed on that status by the court and requested execution of the sentence.

Appellant contends that the sale to Mr. Piispanen involved no intent to defraud and that the evidence is susceptible to only one rational interpretation: that the sale was a mistake caused by disorganization in the administration of a foundering family of corporations. He also questions the trial court's evidentiary rulings and contends that the prosecution destroyed evidence, thus depriving him of a fair trial, and that the sentencing guidelines departure was error. We affirm, but remand to the trial court to provide reasons for departure.

## ISSUES

1. Was the evidence sufficient to sustain the conviction of theft by swindle and of fraud in the offer, purchase or sale of securities?

2. Did the trial court abuse its discretion in allowing evidence of a prior financial transaction of appellant and admitting evidence of statements made by a witness who died before trial?

3. Did the prosecution destroy evidence favorable to the accused, thus depriving him of a fair trial?

4. Did the sentence constitute an unjustified departure from the guidelines?

## FACTS

The facts have been substantially adopted from the State's brief because of its exceptional presentation of a complex series of events.

Charges against appellant arose out of his involvement with at least six different corporations in 1981. Four of these corporations, First Guaranty Corporation, ISD, DSI, and DSE were brother-sister corporations whose joint function was to acquire mortgagee interests in mortgages and vendee interests in contracts for deed and sell them at a profit to private investors. Each of the interests was assigned a four digit contract number and placed on a sales inventory list. Salesmen employed by DSI would contact private investors and sell investment contracts to them from the sales inventory list.

DSE was set up to take in the initial purchase price from investors purchasing a

contract and then disburse monthly payments and so-called "balloon" payments as the contracts matured. An internal computer system was used to govern payments in and payments out; it was designed to pay out monthly interest payments and final balloons only if a positive account balance for the particular contract involved existed. All four of the brother-sister corporations were considered by the people who worked there to be family-run corporations, run by the Campion family.

Savannah Development, Inc., was a corporation set up as a joint venture to develop recreational real estate near McGregor in Aitkin County, Minnesota. The management half of the joint venture consisted primarily of Joseph Campion (appellant's father), Art Raudio and Joseph Omerza. Financing was provided by the second half of the joint venture, Central Investment Corp., a Minneapolis finance company. Savannah Golf, Inc., was a corporation formed by appellant to purchase a McGregor, Minnesota, golf course from Savannah Development, Inc., and manage it. Savannah Golf, Inc., was known as appellant's corporation.

In 1981, Mark Salsbury, the treasurer for ISD, became aware of a series of consecutively numbered mortgages on property located in the Savannah Estates II development in McGregor, Minnesota. These files were located in a drawer in the working area of appellant's wife, Cynthia Campion.

These files bore contract numbers 8389, 8391, 8392, 8435 and 8439. All of these files contained original, unexecuted mortgage notes and deeds. Each of these files also contained a "vendee application" form completed in Cynthia Campion's handwriting. In the usual course of business, the vendee application forms were generally completed and presented to the corporate computer programmers, who would use the information on the forms to program the computer to make monthly payments to the investors. Appellant's corporation, Savannah Golf, Inc., was listed as the contract vendee on the vendee application form included in each of the five files. None of the mortgage deeds or notes contained within the five files had ever been recorded at the Aitkin County Recorder's Office.

Robert Haagenson, a salesman for DSI, met with William Piispanen, an elderly resident of West Eveleth, Minnesota, in May 1981. Haagenson and Piispanen reviewed the sales inventory list of investment contracts based on mortgagee and vendee interests currently available for sale through DSI. Piispanen purchased contract 8389, which was supposed to represent a mortgagee interest on property located in the Savannah Estates II development in McGregor, Minnesota, for $13,922.

Piispanen testified that he had purchased contracts through First Guaranty Corporation and DSI in the past. Piispanen knew that after he purchased contracts, the corporations would mail copies of documents to him evidencing the completed real estate transaction, such as executed mortgage notes. Piispanen testified that after he purchased contract 8389 on May 11, 1981, he did not receive photocopies of any deeds or notes in the mail. Piispanen also testified that after he purchased contract 8389, he received a few monthly payments on the contract from DSI, and then payments stopped.

Appellant was the only person who benefited from the sale of the Savannah Estates II mortgages. William Piispanen's $13,922 payment for contract 8389 was forwarded by salesman Robert Haagenson to DSI in May 1981. Piispanen's money was deposited into the DSI "# 2 account." Appellant was a signatory on the # 2 account, but withdrawals from the # 2 account required the signatures of two signatories. Appellant drew a check on the # 2 account made payable to his corporation, Savannah Golf, Inc., on June 4, 1981, in the amount of $38,175.67. In the memo portion of the check, appellant indicated that the check was for the purpose of purchasing contracts 8389–92. Piispanen's contract number was 8389, and all four contract numbers designated on the memo portion of the check were Savannah Estates II contract numbers. Appellant went to Salsbury and

asked him to cosign the check. Salsbury testified that he normally does not remember specific checks he signed, but he remembers this check because it was so large. Salsbury testified that he asked appellant what the check was for, and appellant told him that the check was for the sale of appellant's house.

Although appellant already had an open personal checking account and an open business account, appellant took the check made payable to Savannah Golf, Inc., for $38,175.67 and an additional check for $5,324.96 and opened a new savings account at First National Bank of Minnetonka in the name of Savannah Golf, Inc. On the same day appellant opened the new savings account, he transferred $3,000 into his personal checking account. During the summer of 1981, appellant spent nearly $20,000 of the money deposited into the new Savannah Golf, Inc., account on largely personal expenditures. The account was closed in September 1981, three months after it was opened, by withdrawing $20,-900 in the form of a cashier's check made payable to appellant's wife.

Investigation revealed that appellant suffered serious personal financial difficulties in early 1981 when he was first president and then vice president of ISD. Officers of the brother-sister corporations discovered a $6,000 shortage in the ISD general account in February 1981. Appellant was the vendee on the contract causing the shortage and payments on the contract were being made to investors. A committee including Larry Liles, Art Raudio, Mark Salsbury, salesman Jack White, and corporate attorney Ward Schendel was formed to investigate the shortage. When appellant was confronted with the shortage at a meeting in March 1981, he told the committee to "go to hell" and left the meeting. Appellant testified at trial that the $6,000 shortage was merely a loan to him from ISD and produced a promissory note reflecting the loan. The signature of corporate attorney Ward Schendel appeared on the promissory note. Schendel testified, however, that he did not sign the promissory note before August 1981, and that he

was not sure when he became aware of the "loan." None of the officers or employees of ISD who testified at trial were aware that appellant had "borrowed" this money until investigation revealed a shortage in the general account.

Additional evidence of appellant's financial difficulties in 1981 included his request for corporate authorization in March 1981 to take out a personal loan of approximately $5,000 from Central and Lowry Credit Corporation. The corporation authorized the loan. Appellant demanded an additional $24,000 in override commissions for his sale of investment contracts at a board meeting on February 6, 1981. Evidence established that appellant was a gambler. He also admitted to salesman Jack White that he owed approximately $29,000 in back taxes to the Internal Revenue Service in 1981. Appellant's personal financial records showed that in May 1981 his checking account began going into negative balance and by early June 1981 appellant was almost $800 in the red.

At trial, appellant claimed that Savannah Development, Inc., the corporation that owned the Savannah Estates II property, agreed to sell some of this property to appellant in 1981. Appellant also testified that he asked his father, one of the partners in Savannah Development, Inc., to place mortgages on the property before it was transferred to appellant and advance the money to appellant immediately. Appellant testified that Savannah Development, Inc., agreed to this and placed mortgages on the Savannah Estates II property before it was transferred to appellant. Appellant testified that because he was the rightful mortgagee on the mortgage contracts consisting of Savannah Estates II property, and since he was entitled to the purchase price paid by investors on those contracts, he rightfully withdrew $38,-175.67 from the DSI #2 account in June 1981. Appellant then argued that he had made $56,000 worth of advances to Savannah Golf, Inc., over the past two years, so he was entitled to withdraw monies from

the newly opened Savannah Golf, Inc., savings account for his own use.

Appellant's father, Joseph Campion, and he were the only two individuals at trial who testified that Savannah Development, Inc., placed mortgages on the Savannah Estates II property and then loaned the money to appellant. Art Raudio, Joseph Campion's partner in the management half of Savannah Development, Inc., testified at trial, but did not testify that Savannah Development, Inc., had loaned appellant any money. Pat Hauer, Jerry Hauer and James Maeder, the principals of the financing half of Savannah Development, Inc., testified that they did not know that appellant and his father claimed that Savannah Development, Inc., placed mortgages on the Savannah Estates II property until October 1981, after the irregularities in the Savannah Estates II mortgage contracts had been discovered. Pat Hauer, Jerry Hauer and James Maeder all testified that they never agreed to loan any money to appellant and that, to their knowledge, no loan was ever made.

Appellant testified at trial that he obtained permission from Joseph Omerza to place mortgages on the Savannah Estates II property before the property was transferred from Savannah Development, Inc., to Savannah Golf, Inc. Appellant's father testified at trial, however, that appellant asked him for permission to place mortgages on the Savannah Estates II property.

Mark Salsbury, the treasurer for ISD, asked appellant in 1981 about the problems with the Savannah Estates II mortgages. Appellant told Salsbury that he (appellant) would make the payments on the mortgages and "there's nothing that can be done."

Appellant testified at trial that Savannah Development, Inc., placed mortgages on the Savannah Estates II property before it was transferred to Savannah Golf, Inc. Appellant told salesman Jack White, however, that he had placed mortgages on the properties.

Appellant's father testified at trial that Savannah Development, Inc., had placed the mortgages on the Savannah Estates II

property and then loaned the money received from the mortgages to appellant. Joseph Campion never told Securities Division investigators or any other employee or officer of any of the six corporations involved that Savannah Development, Inc., had loaned money to Savannah Golf, Inc. Joseph Campion knew that the Savannah Estates II properties had been mortgaged twice before. Yet the sales inventory list including contract 8389, the Savannah Estates II mortgage contract sold to William Piispanen, included information that that particular property had no prior encumbrances.

The jury returned verdicts of guilty of both theft by swindle and fraud in the offer, purchase or sale of securities.

## DISCUSSION

### I

Appellant claims the evidence was insufficient to sustain his conviction. In reviewing this claim, we must determine whether:

> under the facts in the record and any legitimate inferences that can be drawn from them, a jury could reasonably conclude that the defendant was guilty of the offense charged. *State v. Merrill,* 274 N.W.2d 99 (Minn.1978). The evidence must be viewed in the light most favorable to the prosecution and it is necessary to assume that the jury believed the State's witnesses and disbelieved any contrary evidence. *State v. Wahlberg,* 296 N.W.2d 408 (Minn.1980).

*State v. Ulvinen,* 313 N.W.2d 425, 428 (Minn.1981).

We need not review the record in exhaustive detail to show that sufficient evidence was produced indicating that appellant had the motive and opportunity to steal and acted with intent to defraud. Appellant's basic contention is that his actions did not indicate a criminal intent and that he lacked actual criminal intent. The prosecution presented a "paper trail" case, which was, in considerable part, circumstantial. We

reproduce in this opinion a chart used by the State which will assist in understanding the series of transactions which were the subject of this prosecution.

As illustrated by the chart, mortgages were placed on a certain property owned by Savannah Development, Inc., but were not executed. The particular "mortgage" was transferred to ISD, thence to DSI and sold to Piispanen. The proceeds passed through DSE to DSI and thence to Savannah Golf, Inc., a corporation owned by appellant, and thence into a new account at First National Bank of Minnetonka and to appellant. Appellant claimed that he was given permission by his father and Joseph Omerza to place mortgages on the property while it was owned by Savannah Development as a means of lending him the money and that failure to execute the mortgages was a mere oversight. However, the evidence showed several facts inconsistent with his version which were established to the jury's evident satisfaction.

(1) The unexecuted mortgages were discovered in his wife's drawer at ISD.

(2) He was in serious financial difficulties at the times material and owed $30,000 in back taxes to the IRS.

(3) He had, previously that year, gotten an unauthorized loan from ISD, with a dubious paper trail.

(4) Omerza was unlikely to agree to lend him money because Omerza told witnesses on his deathbed that appellant was "bad news."

■ In viewing all of the evidence in the light most favorable to the State, we conclude that the evidence was sufficient to show that appellant intended to and did defraud William Piispanen when he caused the offering of nonexistent, unexecuted, unrecorded mortgages for sale and then used the proceeds of those sales for his own personal ends.

II

■ Appellant challenges two evidentiary rulings of the trial court. The first

involves the admittance of testimony concerning a $6,000 shortage in the ISD general account in February 1981. The record shows that the shortage was caused by payments made to an investor on a contract where appellant was the vendee. At trial appellant claimed he "borrowed" the money from ISD. The evidence was relevant to establish appellant's motive by showing his financial difficulties in 1981, and was thus admissible under Rule 404(b), Minn.R.Evid.

Appellant's second contention is that the trial court abused its discretion when it admitted testimony regarding statements Joseph Omerza made to two individuals while he was hospitalized in late 1981 with terminal cancer. Omerza died in December 1981. Appellant claims the evidence was inadmissible hearsay.

Jack White testified regarding a conversation he had with Omerza at the hospital:

Q: What kind of conversation did you have with [Omerza] in November?

A: Well, in regard to this case, I brought up we were having problems with [appellant] and these particular mortgages and not receiving payments, and he told me that he did not intend to make any payments, and Joe seemed very upset about that. He said he couldn't understand why.

Robert Haagenson testified about his conversation with Omerza:

Q: What did Mr. Omerza have to say about Tim Campion?

A: I asked him what happened to Tim Campion. I didn't know he had quit or had left the company and he told me he wasn't with us anymore. I asked him why, and he says he's bad news * * *.

Q: I'm sorry.

A: He said he's bad news.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 801(c), Minn.R.Evid.

The State contends that Omerza's statements were offered not to prove Campion's character but to show Omerza's state of mind regarding Campion. The White conversation was arguably relevant to show Omerza was upset with appellant and upset that mortgage payments on the Savannah Estates II contracts were not paid. The Haagenson conversation was arguably relevant to show Omerza distrusted and disliked appellant. Appellant had testified that Omerza gave him permission to place mortgages on the Savannah Estates II property before the property was transferred from Savannah Development, Inc., to Savannah Golf, Inc.

The first statement to White is not hearsay. It was not admitted to prove the truth of the assertions made, but merely to indirectly and inferentially show Omerza's state of mind. *See Betts v. Betts*, 3 Wash. App. 53, 473 P.2d 403 (1970); McCormick, *Evidence*, §§ 249, 294 (1972).

The second statement, to Haagenson ("he's bad news"), is hearsay because it is reasonably understood as an assertion by Omerza of his feelings toward Campion, which it is offered to prove. However, under the "state of mind" exception to hearsay, "a statement of the declarant's then existing state of mind, emotion, sensation, * * *" is admissible. Omerza's statement falls within this exception.

Appellant argues that this exception cannot be used to establish the declarant's previous actions, citing the 1977 committee comment to Rule 803 and *Troseth v. Troseth*, 224 Minn. 35, 28 N.W.2d 65 (1947). However, the statement here was not used to establish Omerza's (the declarant) prior actions; if it proved anyone's prior conduct, it helped in proving *appellant's* previous actions in placing the Savannah Estates II mortgages for sale on the sales inventory list and thus is permitted under the evidentiary rules.

### III

Appellant claims he was denied his right to a fair trial through the loss of a note

written by Jack White to the Attorney General investigator, John Samuelson. After White completed his testimony, he checked out of his hotel in Hibbing, Minnesota. He left a note with the desk clerk for Samuelson. Samuelson testified the note read, "How about my [real estate broker's] license back or an academy award?" Believing it to be a joke, Samuelson threw the note away. However, before throwing it, Samuelson read the contents of the note to a third party in the presence of Elaine Lee, a secretary in the County Attorney's Office, and Samuelson indicated that Mark Salsbury, a State witness under subpoena, had also read the note.

Susan Mattson, the night clerk, testified that White gave her the note as he checked out of the hotel, telling her, "they will get a kick out of this." The State had White returned to the court and the defense called him as a witness but failed to ask him any questions regarding the note.

Appellant asserts that his defense was prejudiced by his inability to enter the note into evidence. He contends that the note constituted independent evidence of White's motives and that its destruction deprived him of the opportunity to present a complete defense.

First, it is unclear why appellant failed to call either Elaine Lee or Mark Salsbury as witnesses on the note. Further, appellant's assertion that it could not cure the loss of the evidence through vigorous cross examination of Jack White is not well founded. From a practical view, the absence of the note was more useful to the defense than its admission because arguably the impeachment of White was stronger with the missing note.

In determining whether the destruction of the note irreparably prejudiced the defense, the Minnesota Supreme Court has indicated that we must examine the intent of the person destroying the evidence and the materiality of the evidence. *State v. McGill,* 324 N.W.2d 378, 379 (Minn.1982); *State v. Carlson,* 267 N.W.2d 170, 174–75 (Minn.1978).

Here, appellant has failed to show that the note was destroyed in an attempt to avoid discovery of evidence beneficial to the appellant. John Samuelson testified he threw away the note innocently, believing it to be a joke. Susan Mattson corroborated this interpretation. Moreover, the note here was not essential to appellant's defense; it was not exculpatory but merely impeaching. As indicated, Jack White could have been questioned about the note and his motives in writing it. Elaine Lee and Mark Salsbury were both available as witnesses. Thus, the note was not irreplaceable material evidence whose loss requires the sanction of acquittal. *See McGill,* 324 N.W.2d at 379; *State v. Koehler,* 312 N.W.2d 108, 109 (Minn.1981); *State v. Hill,* 287 N.W.2d 918, 920 (Minn. 1979).

### IV

Appellant was sentenced on the conviction for theft by swindle. The presumptive sentence, based on appellant's criminal history score of zero, is one year and one day stayed. After rejecting probation conditions, appellant requested execution of his sentence and the trial court sentenced him to 18 months in the custody of the Commissioner of Corrections. In his departure report, the trial court noted that appellant committed a major economic offense and that two or more of the specific aggravating factors were present, although it did not state exactly which ones.

Appellant does not argue that aggravating factors were not present; rather, he claims the particular reasons were not set forth as required by the Sentencing Guidelines II.D. and Minn.Stat. § 244.10, subd. 2 (1982). *See State v. Garcia,* 302 N.W.2d 643 (Minn.1981).

Appellant's offense was a major economic offense, defined by the Guidelines as "an illegal act or series of illegal acts committed by other than physical means and by concealment or guile to obtain money or property, to avoid payment or loss of money or property, or to obtain business or professional advantage." Minnesota Sen-

tencing Guidelines and Commentary, II.D. 2.b, subd. 4 (1983).

Two or more of the following circumstances are aggravating factors for economic offenses:

(a) The offense involved multiple victims or multiple incidents per victim;

(b) The offense involved an attempted or actual monetary loss substantially greater than the usual offense or substantially greater than the minimum loss specified in the statutes;

(c) The offense involved a high degree of sophistication or planning or occurred over a lengthy period of time;

(d) The defendant used his or her position or status to facilitate the commission of the offense, including positions of trust, confidence or fiduciary relationships; or

(e) The defendant has been involved in other conduct similar to the current offense as evidenced by the findings of civil or administrative law proceedings or the imposition of professional sanctions.

We agree with appellant that the trial court's simple recitation of possible aggravating factors accompanied by a statement that two or more of those factors exist does not comply with the requirement of specifying the aggravating factors used in the particular case. It does appear that several of these factors are present in this case, however. We therefore remand the case to the trial court to provide specific reasons so that appellant need not speculate on the reasons for departure. *See State v. Leibfried,* 309 N.W.2d 36 (Minn. 1981).

## DECISION

The evidence was sufficient to convict appellant of theft by swindle and fraud in the offer, purchase or sale of securities. The trial court's rulings on evidentiary questions did not constitute an abuse of discretion because the evidence regarding prior financial transactions was relevant to establish motive and because statements made by a witness who died before trial were properly admissible as non-hearsay statements and as "state of mind" hearsay statements. The destruction of a note made by a witness and left to a State investigator did not deprive appellant of a fair trial and the trial court erred in not specifying the reasons for departure when it merely referred to a list of five aggravating factors and stated that two of them were present. Thus, we remand the case to the trial court to specify the aggravating factors justifying durational departure in this case.

Affirmed in part and remanded to the sentencing court to provide durational departure reasons.