539 So.2d 50 (1988)
STATE of Louisiana, Appellee,
v.
Kenneth Wayne MAGOUIRK, Appellant.
No. 19807-KA.
Court of Appeal of Louisiana, Second Circuit.
September 21, 1988.
On Rehearing February 22, 1989.
*52 Darrell D. Cvitanovich, Baton Rouge, for appellant.
William J. Guste, Jr., Atty. Gen., William B. Faust, III, Asst. Atty. Gen., James A. Norris, Jr., Dist. Atty., Joseph T. Mickel, Asst. Dist. Atty., Monroe, for appellee.
Before MARVIN, SEXTON and LINDSAY, JJ.
SEXTON, Judge.
The defendant was charged by amended indictment with the crime of second degree murder. After a jury trial, the defendant was found guilty of manslaughter and sentenced to the maximum 21 years at hard labor. The defendant appeals his conviction asserting five assignments of error. We reverse and remand.

FACTS
On March 29, 1986, 24-year-old Katherine Thomas was found to be missing from her mobile home and a report was filed with the Ouachita Parish Sheriff's Office. Investigation revealed that Ms. Thomas was last seen by her grandmother, Mrs. Arrant, in Kathy's home on the previous evening, Good Friday, March 28, 1986. Mrs. Arrant, who lived next door to Kathy, had visited with her, shared the evening meal and watched television while Kathy painted ceramic Easter decorations until approximately 10:00 p.m. on Good Friday. They each had a sandwich for supper and consumed no alcohol. Mrs. Arrant left Kathy and walked to her own home next door around 10:00 p.m. Kathy's grandmother testified that when she left Kathy was wearing a pair of royal blue "teddy" type shorty pajamas.
Kathy had the day off from her job at St. Francis Hospital on Good Friday but did not show up for work as scheduled at 6:00 a.m. on Saturday, March 29, 1986. Kathy's grandmother observed that Kathy's blue Mustang had not been moved from the mobile home by 7:00 a.m. on Saturday morning, and knocked on the bedroom door of Kathy's house. There was no response and Kathy's grandmother assumed that she had ridden to work with a friend. By late afternoon when Kathy did not make her appointment to go fishing with her grandmother and when it was learned that Kathy had not reported to work that day, the family, and later the sheriff's office, were notified.
Investigation revealed that there were three outside doors opening into the mobile home. The doors opening into Kathy's bedroom and into her living room area were locked but the door opening into the kitchen was found unlocked. There was no sign of forced entry.
The family and investigators observed that the inside of the residence appeared to be neatly organized and clean in the manner Kathy normally kept her home. The one obvious exception to Kathy's remarkable tidiness was the condition of the bedroom. In the bedroom, the electric blanket was still on and the bedspread, pillows and sheets were completely disorganized. Kathy's watch, necklace, rings and purse containing her keys were found on a nightstand beside her bed. Calls to friends and work associates concerning her whereabouts proved to be fruitless at that time. Six days later, Kathy Thomas's body, clad only in panties, was found by Donald Storey, a construction worker. He observed her body floating face down in a creek under a bridge on the new Natchitoches Road near Cheeks Road in Monroe.
Forensic anthropologist William Rodriguez, Ph.D. estimated that the time of death was consistent with Kathy's disappearance on the early morning of March 29, 1986.
Forensic pathologist George McCormick, M.D. opined that death was caused by drowning. The body had a two-inch contusion *53 or bruise above the right ear which was not severe enough to cause death but was sufficient to cause unconsciousness. The possibility existed, therefore, that the victim either was struck and placed into the water while unconscious, thereafter drowning, or that she sustained a hemorrhage in the fall to the water from the bridge under which she was found. No other evidence of trauma to the body was found. However, the state of decomposition of the body tissues and discoloration and skin slippage possibly could have obscured evidence of small pre-death injuries. There was no evidence of abuse of common drugs and the slightly elevated tissue fluid ethanol level was probably due to post-mortem metabolism of ethanol producing bacteria during decomposition.
On the same day that Kathy Thomas's body was found, police received a tip that the defendant, Kenneth Wayne Magouirk, apparently had a fetish for certain types of female apparel and was in fact in possession of certain items of lingerie taken in a burglary of the victim's home back in February of 1986. Police then learned that Magouirk's live-in girlfriend, Lisa Day, worked at the same place and in the same department as the victim, Kathy Thomas. Deputies proceeded to Magouirk's father's residence in south Ouachita Parish. However, Magouirk became aware that deputies were there to talk to him and he fled into the woods where he remained for some time until his mother, using a patrol unit public address system, called the defendant out of the woods. Magouirk was then arrested for suspicion of burglary. Following his arrest, evidence was discovered which implicated Magouirk in Thomas's murder.
On March 29, 1986, the day Thomas was reported missing, Richard Hartley, a school teacher in Ouachita Parish, told investigators that he had to swerve across the center line of travel to pass a pickup truck parked partially on the shoulder of Jim Arrant Road near the pine thicket which was adjacent to the Thomas residence. Hartley said that he recalled that the pickup truck had something shiny such as chrome, on its rear. Shortly after Magouirk's arrest, his pickup truck was seized (a tan Toyota pickup truck with a chrome bumper).
Plaster casts were made of tire tracks observed on the shoulder of Jim Arrant Road in the general area Hartley had described. When Magouirk's truck was seized, four new tires were on the truck. After some investigation, police learned from Pete Knights, of Moore and Patron Goodyear Tire Company, that four new tires were sold to Magouirk on April 2, 1986, four days after Kathy's disappearance. Police then learned that the old tires, which were found at Magouirk's mother's residence, had been sold to Magouirk only the previous November, 1985 and had very little wear on them. FBI experts could not eliminate these tires as being the ones which made the tracks depicted in the casts.
Plaster casts of shoe prints found near the victim's body on the creek bank were compared with an athletic shoe found beneath the defendant's bed in his residence and while they were not positively matched, Magouirk's shoe could not be eliminated as having made the footprint from which the plaster cast came.
Carpeting from the defendant's pickup truck, along with sheets, bedspread and a pillow case collected from the victim's home were analyzed. A strand of hair with characteristics matching the defendant's was discovered on the victim's bed sheets. In addition, a strand of head hair that had been forcibly removed from the victim was found in the carpeting sample taken from the defendant's pickup truck.
An unusual ridge-patterned latent fingerprint taken from the doorknob on the front door of the residence was found to be of the same pattern as one found on the driver's door of the defendant's pickup truck. Analysis determined that the latent prints from the victim's trailer doorknob and those found on the defendant's truck window were made by a rubber glove.
Deputies executed a search warrant at Magouirk's father's residence in the vicinity of the Ouachita River and surrounding *54 area. During the course of the execution of this search warrant, deputies discovered a paper sack floating in the Ouachita River which contained a number of items of women's clothing such as panties, bras, pantyhose, swimwear and sleepwear. The sack was found only a short distance from where the defendant, Kenny Magouirk, was arrested.
The sack and its contents were analyzed and a head hair found on a body suit in the sack could not be distinguished from a sample head hair submitted by the defendant.
Several items in the sack were identified as belonging to Kathy Thomas although the royal blue teddy Kathy was last seen in was never recovered.

ASSIGNMENT OF ERROR NO. 1
In this assignment of error, defendant asserts that the trial court erred in admitting, over objection, the former testimony of Alfred Durbyn, in violation of defendant's constitutional rights to confrontation and cross-examination, so as to deprive him of the right to test the sufficiency of the State's case with the effective assistance of counsel.
Specifically, defendant argues that the admission of the former testimony of Alfred Ray Durbyn, consisting of an inculpatory statement allegedly made by defendant to Durbyn, which was not corroborated by other evidence, or in contravention of the declarant's penal interest, deprived defendant of the right to confront and cross-examine a crucial prosecution witness, notwithstanding the fact that the earlier testimony of the witness was perpetuated by defense counsel of record pursuant to LSA-C.Cr.P. Art. 296 at the same time a motion to suppress the statement was pending before the trial court.
On August 6, 1986 defense counsel filed a "Motion for Preliminary Examination for the Perpetuation of Testimony and for the Fixing of Bail." On October 3, 1986, prior to the preliminary examination hearing, defense counsel filed a motion to suppress an inculpatory statement made by defendant to a cell mate named Alfred Durbyn.
At the hearing for perpetuation of testimony and fixing bail, the State made it clear at the outset that it did not desire to perpetuate testimony. Instead, only defense counsel called witnesses. One of the witnesses called and whose testimony was perpetuated was Alfred Durbyn, a former cell mate of the defendant. At that time, Durbyn was awaiting sentence on four criminal charges in Ouachita District Court, misdemeanor theft, unauthorized use of a movable, attempted simple burglary, middle grade theft and two counts of felony theft. Two counts of felony theft were dismissed by the State contemporaneous with the defendant's plea. The various sentences that Mr. Durbyn received were all assessed consecutively and amounted to six months in jail and four years at hard labor. Apparently, charges were pending against Mr. Durbyn in other jurisdictions at that time as well.
Defense counsel questioned Durbyn as to how he knew Magouirk, what statements were made by Magouirk and how the conversation was initiated. Defense counsel then elicited testimony from Durbyn to the effect that Magouirk allegedly told him that he had picked up Kathy Thomas at her residence, had oral sex with her in his truck and then "wasted" her. Defense counsel immediately claimed surprise at the testimony, asked to treat the witness as hostile and cross-examine him.
Counsel was denied the right to cross-examine the witness but did delve into when Durbyn pled guilty to the charges against him, elicited testimony that his plea was entered July 7, 1986 and that the conversation with Magouirk took place shortly thereafter, between July 10 and July 31, 1986.
After the prosecution had cross-examined Durbyn defense counsel again asserted surprise and the prosecution again argued no surprise was shown. The trial court, expressing some confusion as to why testimony was even being perpetuated and why "surprise" was even an issue, sustained the prosecution's objection to defense counsel's attempts to impeach its *55 own witness and cross-examine the witness.
Subsequently, a hearing was held on defendant's motion to suppress Durbyn's statement. Durbyn's attorney, James Edwards, was called by the State. Testimony elicited through him revealed Durbyn was at no time an agent of the State and that no express plea bargain had been arranged in consideration for his testimony. However, it was shown Durbyn was apprehensive about remaining in the same cell with Magouirk after Magouirk had threatened him with death if he ever told anyone what Magouirk had told him. Defense counsel then attempted to call Durbyn on cross-examination and this request was also denied. However, defense counsel was allowed to call Durbyn on direct examination at which time Durbyn basically reiterated what he had said previously about Magouirk's confession. The court concluded by denying defendant's motion to suppress the statements to Durbyn.
At trial, Durbyn was called by the State. He testified that his statements made at the preliminary examination on October 9, 1986 were truthful. He then refused to testify further, stating "I would like to exercise my rights to the Fifth Amendment." Outside the presence of the jury the judge stated he saw no basis for assertion of the Fifth Amendment privilege. Durbyn was then called again and ordered to testify. He refused. The judge found him in contempt and the prosecution asked the court to find the witness legally unavailable and sought to have the perpetuated testimony introduced. The jury was removed while defense counsel argued against introduction. Defense counsel first argued that the perpetuated testimony was not from a preliminary examination. Secondly, he argued he was given no opportunity to cross-examine Durbyn at the earlier hearing.
The trial court noted defendant's objection but allowed the playing of Durbyn's testimony from the preliminary examination in its entirety.
Later in the trial, defense counsel was allowed to call Timothy Minor who had been a cell mate of Durbyn's. Testimony solicited from Minor indicated the possibility that Durbyn could have struck a deal with the prosecution in exchange for his testimony against Magouirk.
Still later in the trial, defense counsel sought again to call Durbyn on cross-examination. Defense counsel reasserted his claim that he had never been given an opportunity to cross-examine Durbyn. The judge agreed that defense counsel had never cross-examined Durbyn, but indicated that he would not allow cross-examination as Durbyn was originally the defense's witness. Defense counsel then claimed Durbyn was shown to be a hostile witness and that cross-examination would be proper. The trial court agreed but still maintained that since Durbyn had chosen not to testify in any form he would not allow defense counsel to recall him before the jury. Durbyn was then recalled outside the presence of the jury. Defense counsel tried to elicit information concerning Durbyn's criminal record and Durbyn stated he would "like to stay out of this altogether."
In the instant case defense counsel sought and was granted a "preliminary examination for the perpetuation of testimony and the fixing of bail." Transcripts of the testimony of witnesses who testify at such preliminary examinations are admissible for any purpose at any subsequent proceeding in the case, on behalf of either the defendant or the State, if the court finds that the witness is dead, too ill to testify, cannot be found, or is otherwise unavailable for testimony and that the absence of the witness was not procured by the party offering the testimony. LSA-C. Cr.P. Art. 295(B). A witness may be unavailable within the terms of the article when he claims the privilege against self-incrimination under the Fifth Amendment to the United States Constitution. State v. Dotch, 298 So.2d 742 (La.1974), cert. denied, 420 U.S. 976, 95 S.Ct. 1401, 43 L.Ed. 2d 657 (1975).
Durbyn's testimony was unavailable at trial as he claimed the privilege. It is apparent from the record that the absence of the testimony was not procured by the *56 State. Regardless of whether he had grounds to assert the privilege, that is, whether his testimony would truly be self-incriminating, his testimony was functionally unavailable. See State v. Nall, 439 So. 2d 420 (La.1983); State v. Ghoram, 328 So.2d 91 (La.1976). See generally State v. Pearson, 336 So.2d 833 (La.1976). Therefore, it was entirely procedurally proper that Durbyn's previously perpetuated testimony be introduced.
The inquiry does not end here, however. Unavailability of the testimony is not the only showing necessary for the introduction of transcripts from a prior hearing. A defendant's constitutional protections likewise must not be offended. Particularly susceptible to derogation where such transcripts are used later is the defendant's right of confrontation.
The most recent pronouncement by the United States Supreme Court on this issue is Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980).
In Roberts, the defendant was charged with forgery of a check. At the preliminary hearing, the only defense witness testified adversely to the defendant. No request was made by defense counsel to cross-examine the witness nor did the prosecutor question the witness.
Before trial, five subpoenaes were issued to the witness who nevertheless failed to appear at trial. Pursuant to a State statute authorizing it, the State offered into evidence the transcript of the witness' testimony taken from the preliminary examination. Defendant objected to the use of the transcript as violative of the confrontation clause of the Sixth Amendment. The transcript was admitted into evidence at trial but this ruling was reversed on appeal. The Ohio Supreme Court, upheld the Court of Appeal holding that "the mere opportunity to cross-examine at a preliminary hearing did not afford constitutional confrontation for purposes of trial." The United States Supreme Court upheld the trial court finding that the defendant's right to cross-examination had not been violated, noting that "the confrontation clause reflects a preference for face-to-face confrontation at trial and that `a primary interest secured by [the provision] is the right of cross-examination.' Douglas v. Alabama, 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965)."
In addressing the issue of whether or not there existed a valid cross-examination, the court conducted a close comparison of the Roberts case to the facts of California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). In Green, a witness identified Green as a drug supplier at a preliminary hearing. When called to the stand at trial, however, the witness claimed a lapse of memory. The prosecution offered the witness' prior statement into evidence amid objection based upon Sixth Amendment grounds. The United States Supreme Court rejected the confrontation clause attack as it found that at the preliminary examination the witness was under oath, was represented by counsel and that the defendant had every opportunity to cross-examine the witness. The court concluded, therefore, that the testimony complied with the Sixth Amendment demands: "substantial compliance with the purposes behind the confrontation requirement." Although there is a suggestion in Green that the mere opportunity to cross-examine a witness is sufficient, the Roberts court noted that the Green record demonstrated that defense counsel had cross-examined the witness at the earlier proceeding.
After comparing Green with the facts of Roberts, the court refused to decide the difficult issue of whether or not the mere opportunity to cross-examine rendered the prior testimony admissible as it found that counsel's questioning clearly partook of cross-examination as a matter of "form" which was the equivalent of significant cross-examination. The presentation, the court noted, was "replete with leading questions, the principal tool and hallmark of cross-examination" and "comported with the principal purpose of cross-examination: to challenge `whether the declarant was sincerely telling what he believed to be the truth ...'" Finally the court attached importance to the fact that as in Green there was no objection by the prosecutor or intervention *57 by the court relevant to the form of questioning.
In the present case, the prosecution's argument in brief with regard to cross-examination is twofold. First, it is argued that Magouirk's counsel's direct examination of Durbyn was tantamount to cross-examination and that there was substantial compliance with defendant's right to confrontation. Secondly, the prosecution argues that by calling Durbyn as its own witness at the preliminary examination, defense counsel made a valid waiver of the right to cross-examine Durbyn.
Contrary to the State's assertions, we cannot determine that there has been substantial compliance with the right of confrontation or questioning tantamount to cross-examination. The record reveals that every attempt by defense counsel to cross-examine Mr. Durbyn was thwarted by the prosecution's objections which were sustained by the trial court. Therefore unlike Green and Roberts, defense counsel was significantly limited as to the scope and nature of questioning. Additionally we cannot determine that the manner of direct examination was tantamount to cross-examination or amounted to substantial compliance with the purposes behind the confrontation requirement. The transcript reveals very little in the nature of leading questions and the questioning did little to challenge the veracity of the witness' testimony. Even after listening to an audio tape of the hearing on the preliminary examination, we remain unconvinced that the questioning was anywhere near the level of significant cross-examination contemplated in Ohio v. Roberts, supra. See also State v. Citizen, 431 So.2d 1051 (La.1983); State v. Kaufman, 304 So.2d 300 (La.1974).
We likewise fail to find merit in defendant's argument relating to the waiver of cross-examination. Louisiana Revised Statutes relevant to impeachment provide:
15:486. Right of each side to impeach
Each side has the right to impeach the testimony and credibility of every witness sworn on behalf of the other side.
15:487. Impeachment of own witness
No one can impeach his own witness, unless he have been taken by surprise by the testimony of such witness, or unless the witness show hostility toward him, and, even then, the impeachment must be limited to evidence of prior contradictory statements.
The trial court apparently used the rule of LSA-R.S. 15:487 to prevent cross-examination of Durbyn throughout the proceedings. While procedurally correct, the rules of evidence cannot be mechanically applied so as to frustrate the constitutional rights of an accused and defeat the ends of justice. The "voucher" rule of LSA-R.S. 15:487 cannot be applied so as to deprive a defendant of his constitutional right to confrontation. See Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).
It is important to remember that the instant witness was a convicted felon awaiting sentence. Certain of his pending charges had been dismissed in consideration for his guilty plea. Apparently, other charges were pending in other jurisdictions of the state. Each time defense counsel attempted to delve into Durbyn's record, potential bias or the circumstances of his plea, the State objected. Under these circumstances, we cannot find that defense counsel waived the right to test the bias and credibility of the witness Durbyn, even though Durbyn was called as a witness by the defense.
Thus, because the defendant's right to confront and cross-examine was denied, the substantially untested evidence provided by Durbyn should not have been admitted at trial. The fact that the trial court allowed the introduction of a certified copy of Durbyn's criminal record to be introduced into evidence and that Durbyn was seen briefly in prison garb and shackles at trial does not make up for the impact that effective cross-examination of Durbyn could have had on the jury. The lack of cross-examination has effected a substantial denial of the defendant's right to confrontation which cannot be regarded as harmless or waived. Accordingly, defendant's conviction *58 must be reversed and the case is remanded for a new trial.

ASSIGNMENT OF ERROR NO. 2
Because we are remanding this cause for a new trial, it is necessary that we discuss certain of the defendant's other assignments of error, as they will undoubtedly be at issue in a second trial.
In assignment of error number two, defendant argues that the trial court erred in admitting prejudicial evidence of "other crimes" allegedly committed by defendant, and further erred when it failed to specifically instruct the jury as mandated by State v. Prieur, 277 So.2d 126 (La.1973).
The State originally sought to have evidence of five burglaries allegedly committed by Magouirk to be held to be admissible at trial. The alleged victims were the victim of the homicide, Kathy Thomas (two separate burglaries), Kaye Rothwell, Karen Cloyd, Billie Lynn Weaver and Linda McCaskill. After a hearing on the defendant's Prieur motion the trial court ruled that evidence of the March 28-29, 1986 burglary of Kathy Thomas' trailer (as part of the res gestae of the charged offense), evidence of the March 7-10, 1986 burglary of Karen Cloyd's trailer, and evidence of the March 28, 1986 burglary of Kaye Rothwell's apartment was admissible. Held inadmissible was evidence of the February 17, 1986 burglary of Kathy Thomas' trailer and the evidence of the Weaver and McCaskill burglaries.[1]
On appeal, the defendant alleges three-fold error. First, he alleges that evidence of the Rothwell and Cloyd burglaries was improperly admitted. Secondly, he alleges that the court allowed evidence of the February 17, 1986, Thomas burglary to be introduced even after it had originally held it to be inadmissible. Finally, he alleges if the evidence was properly admitted, the jury was not properly instructed as per the Prieur mandate.
Evidence of other crimes related to the offense with which a defendant is charged is generally inadmissible except under special exceptions. Aside from related offenses admissible as part of the res geste and convictions admissible for impeachment purposes, Louisiana's statutes provide for only three exceptionsacts relevant to show intent, knowledge and system. State v. Prieur, supra. Relevant statutory provisions are as follows:
15:445. Inference of intent; evidence of acts similar to that charged.
In order to show intent, evidence is admissible of similar acts, independent of the act charged as a crime in the indictment, for though intent is a question of fact, it need not be proven as a fact, it may be inferred from the circumstances of the transaction.
15:446. Evidence where knowledge or intent is material and where offense is one of a system.
When knowledge or intent forms an essential part of the inquiry, testimony may be offered of such acts, conduct or declarations of the accused as tend to establish such knowledge or intent and where the offense is one of a system, evidence is admissible to prove the continuity of the offense, and the commission of similar offenses for the purpose of showing guilty knowledge and intent, but not to prove the offense charged.
In the instant case the "other crimes" evidence was sought to be admitted under the "system" exception to the general rule of exclusion.
In order to be admissible, other crimes evidence must meet several tests:
(1) there must be clear and convincing evidence of the commission of the other crimes and the defendant's connection therewith; State v. Prieur, 277 So.2d 126 (La.1973), see also, State v. Gaines, *59 340 So.2d 1294, 1298 (La.1977) (concurring opinion); McCormick on Evidence, § 190, pp. 451-52 (2d ed. 1972); (2) the modus operandi employed by the defendant in both the charged and the uncharged offenses must be so peculiarly distinctive that one must logically say they are the work of the same person; State v. Jackson, 352 So.2d 195 (La. 1977); State v. Lee, 340 So.2d 1339, 1345 (La.1977) (concurring opinion); (3) the other crimes evidence must be substantially relevant for some other purpose than to show a probability that the defendant committed the crime on trial because he is a man of criminal character. State v. Frederick, 340 So.2d 1353 (La. 1976); (4) the other crimes evidence must tend to prove a material fact genuinely at issue; State v. Ledet, 345 So.2d 474 (La.1977); (5) the probative value of the extraneous crimes evidence must outweigh its prejudicial effect. State v. Sutfield, 354 So.2d 1334 (La.1978); State v. Jackson, 352 So.2d 195 (La.1977). State v. Henry, 436 So.2d 510, 513 (La. 1983).
Karen Cloyd was the next door neighbor of Magouirk. Magouirk had previously lived in Cloyd's trailer before she and her husband moved in. She knew Magouirk as he had visited her and her husband in the trailer on a couple of occasions previously. On March 10, 1986 she discovered that someone had gone into her residence without her authority and removed several articles of her clothing, one of which was a pair of white and blue floral panties. No items other than female clothing were taken. Jewelry, money, electronics and firearms were left untouched. Entry was determined to have been obtained by removing the silicone around a windowpane, removing the pane, reaching in and unlocking the door. Thus, there were no readily apparent signs of forced entry.
Likewise, in the Rothwell burglary, the rear sliding glass door was off its track and the forced entry was not readily apparent. On the night of the burglary of her apartment, Rothwell had seen and danced with Magouirk at a local nightclub. She knew Magouirk from the hospital where she and Magouirk's girlfriend, Lisa Day, worked. (Coincidentally, Thomas, Weaver, and McCaskill also worked with Rothwell and Magouirk's girlfriend). She later saw Magouirk again coming from the direction of her apartment as she was on her way home. When she arrived at the apartment, she went to let the dog out and noticed the glass door was off the track. Suspecting a burglary, she looked to see what may have been taken. Again, money, jewelry, and electronics were left untouched. She did notice, however, a curling iron she had left on the dresser had been placed on the floor. After she learned of Magouirk's arrest some days later, she checked for missing items of clothing and discovered two swimsuits and a bra missing.
The day after Magouirk's arrest, police found a bag containing numerous items of women's clothing floating in the Ouachita River approximately 150 yards from where Magouirk was arrested. Both Cloyd and Rothwell positively identified numerous items in the bag as belonging to them. A hair found on one of the articles of clothing was matched to sample hairs taken from Magouirk.
Clearly therefore, the evidence presented at the Prieur hearing provided clear and convincing evidence of the commission of the other crimes and the defendant's connection therewith. The modus operandi employed by the perpetrator of these crimes was so peculiarly distinctive that it must be concluded that they were the work of the same person with a fascination for intimate women's apparel. The "other crimes" evidence was presented to prove the prosecution's theory that the homicide of Kathy Thomas was committed during the perpetration of one of these peculiar burglaries and was not presented for the sole purpose of showing the defendant to be a bad character. The "signature" nature of these crimes provided probative value that outweighed the possible prejudicial effects of the introduction of this evidence.
It is important to recall that the victim disappeared as if in thin air. There was no actual forced entry and nothing of value *60 was taken. A bag of women's underwear was found near the point of the defendant's arrest. That bag contained a hair sample that could not be excluded as being that of the defendant. Most importantly, also found in the bag was underwear that belonged to Cloyd and Rothwell in company with similar items belonging to the victim. The only difference between the instant burglary and the burglary of Cloyd and Rothwell is that Cloyd and Rothwell were not at home at the time of those offenses. These circumstances seem to us to present a classic scenario of system.
Appellant also complains that several articles of clothing associated with the February 17 burglary of Thomas' home were improperly admitted at trial, in spite of the trial court's earlier ruling at the Prieur hearing that all evidence of the February 17 burglary was to be excluded. These items, he argues, in addition to several items of clothing introduced into evidence but which were not identified, prejudiced the defendant. The complained of exhibits which were the subject of the Thomas' burglary that were admitted were a J.C. Penny's bra marked S-62 (FBI number Q-76), a black body suit marked S-63 (FBI number Q-77) and a pair of black leotards marked S-64 (FBI number Q-78).[2] Also objected to were S-48, light blue panties, S-53, white nylon panties, S-54, panty hose and S-55, beige panties with lace.
Exhibit S-62 (FBI number Q-76) was introduced without objection. Absent a contemporaneous objection, the evidence was properly admitted. LSA-C.Cr.P. Art. 841; State v. Burdgess, 434 So.2d 1062 (La.1983).
In the November 26, 1986 ruling on the admissibility of Prieur evidence, the trial court stated "[t]he court declines to admit evidence of the February 17, 1986 burglary at trial of this matter." The reason for the trial court's ruling was that the victim's mother could not connect any of these items with the February 17 burglary of the victim's home. At trial, however, the court admitted a garment from that burglary with the stipulation that the victim's mother would not be allowed to identify this garment as being taken in the February 17 burglary. Consequently, the victim's mother was not asked to identify the garment but it was later introduced along with S-64 as one of the articles found in the sack. At no time was reference made to the February 17 burglary. A review of the record reveals that the leotards and the body suit were identified at the Prieur hearing as having been taken from the February burglary. As such, they were probably admissible to begin with. In any case, no reference was made of the February 17 burglary at trial and admissibility of the physical evidence were as generic items taken from the sack found in the river. The same is true of the admission into evidence of the several additional items that were introduced and are complained of but not identified. Assuming arguendo the inadmissibility of this evidence, it was not identified as being connected with any "prior bad acts" and as such caused the defendant minimal prejudice, which was harmless beyond a reasonable doubt.
Finally, appellant argues that other crimes evidence was admitted without the mandatory protective jury instruction required by State v. Prieur, supra. He argues that the jury should have been instructed that the defendant could not be lawfully convicted of any offense other than the charged offense or ones responsive thereto.[3]
Prieur, supra, at p. 130, provides in part:

*61 When the State intends to offer evidence of other criminal offenses under the exceptions of LSA-R.S. 15:445 and 15:446:
. . . .
(4) When the evidence is admitted before the jury, the court, if requested by defense counsel, shall charge the jury as to the limited purpose for which the evidence is received and is to be considered. [Emphasis ours.]
(5) Moreover, the final charge to the jury shall contain a charge of the limited purpose for which the evidence was received, and the court shall at this time advise the jury that the defendant cannot be convicted for any charge other than the one named in the indictment or one responsive thereto.
Here, defense counsel admits no special charge was requested. As such, the defendant waived his right to an express Prieur charge. Moreover, a review of the charge given indicates the trial court substantially complied with the Prieur mandate. Substantial compliance with the Prieur requirements is sufficient and failure to strictly comply with these guidelines does not necessarily warrant reversal. State v. McDermitt, 406 So.2d 195 (La. 1981).
For the reasons stated above, this assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 3
In assignment of error number three defendant argues that the trial court erred in allowing an expert in the field of hair identification to testify, over defense objection, as to the mathematical probability of the accuracy of his identification of certain hair samples.
The testimony complained of is that of special agent Michael Malone of the FBI. The specific objectionable testimony is as follows:
Basically over those twelve years, to go back, I've looked at hair for about ten thousand different divisions, I've only had two occasions out of the ten thousand where I had hairs from two different people that I could not tell apart. Again, it's not a fingerprint, but it's normally a strong association. Record, 1288.
Appellant contends that the above testimony concerned the mathematical probability of the accuracy of the expert's findings. He maintains there was no specific factual foundation given for this testimony, that it invaded the province of a jury and that allowing it impaired his right to the constitutional presumption of innocence.
Title 15 provides the following with reference to expert testimony:
§ 464. Expert testimony
On questions involving a knowledge obtained only by means of a special training or experience the opinions of persons having such special knowledge are admissible as expert testimony.
§ 465. Statement by expert of fact basis of opinion
Every expert witness must state the facts upon which his opinion is based.
§ 466. Qualification of experts
The test of the competency of an expert is his knowledge of the subject about which he is called upon to express an opinion, and before any witness can give evidence as an expert his competency so to testify must have been established to the satisfaction of the court.
A review of the record reveals the expert's qualifications to testify as such were thoroughly brought out by the prosecution on direct examination. Furthermore, defense counsel was given an adequate opportunity to cross-examine the special agent as to his qualifications after which he accepted him as an expert.
*62 After being accepted the special agent gave what he called "a short course on hair exams" and explained the analysis process and characteristics that he looked for.
He qualified his testimony by noting that the use of hair identification was not as precise as the use of fingerprint identification and that generally hair identification merely involves a process of elimination whereby positive identification cannot be achieved. He followed at this point with the statement at issue.
He then testified that the hair found on the bed linens was "completely indistinguishable" from Magouirk's head hair and that it was "consistent with having originated from Magouirk." The same was true, he noted, for hair found on Thomas' black body suit. Further, he found hair taken from the defendant's truck was consistent with the victim's hair.
The special agent, however, was not allowed to testify as to the chances of the cross hair identification being in error.
The record demonstrates that the special agent's testimony concerned his experience and was not tendered for the purpose of establishing statistical probabilities. He in fact was not allowed to testify as to this point. Further, his explanation of the comparison process provided a factual foundation for his testimony as a whole.
Defendant cites State v. Coleman, 486 So.2d 995 (La.App. 2d Cir.1986), writ denied, 493 So.2d 634 (La.1986) as authority for exclusion of the testimony to which he objected. However, the expert in Coleman was asked to determine whether the hair found on the victim's clothing matched the defendant's hair beyond a reasonable doubt. In such a case, this court found the answer would invade the province of the jury. Here, the most that was said was that the hairs were "completely indistinguishable" and were "consistent with having originated" from the defendant or victim. This testimony, tempered by the expert's qualification as to the accuracy of hair identification, without evidence of statistical probabilities, did not invade the province of the jury.
Defendant also cites United States v. Massey, 594 F.2d 676 (8th Cir.1979) which is factually quite similar to the instant case. In Massey, the expert was questioned by the trial judge as to mathematical statistical probabilities as to the correctness of hair analysis.
In Massey, the fundamental challenge related primarily to the prejudicial effect of mathematical statistical probability as elicited and interpreted by the trial judge and argued by the prosecutor. The Eighth Circuit found error, though harmless, in the court's colloquy with the witness concerning mathematical probabilities. In the eyes of the court the colloquy was speculative and confusing. However, the court went on to say "[t]he gravamen of the error came during the trial judge's comment construing the testimony in terms of the probability of making an erroneous identification through the comparison of hair samples." The court found that prejudicial harm did not arise until the government's closing summation, which exacerbated the trial judge's understanding of the evidence. Massey, supra, at 680.
In the instant case, although the expert, as in Massey, testified as to his experience concerning hair identification, there was no interjection on the part of the court that would amount to the level of error that occurred in Massey. Clearly the expert was prohibited from testifying as to statistical probabilities in the instant case. The complained of testimony merely stems from the actual experience and knowledge of the expert. His remaining testimony simply failed to eliminate defendant from the comparison. The terms "completely indistinguishable" and "consistent with having originated from" shed no light on the probability of correctness of the hair analysis and therefore do not invade the province of the jury.

ASSIGNMENT OF ERROR NO. 4
In this assignment of error defendant complains that the trial court erred when it denied defendant's motion to suppress evidence, and further erred when it admitted evidence of crimes previously suppressed *63 by the court, as well as physical evidence not associated with any acts committed by defendant.
Under this assignment of error, the defendant asserts a hodgepodge of arguments related to various items of physical evidence admitted at trial. Arguments relative to the admissibility of other crimes evidence, specifically evidence as to system, have been addressed earlier in this opinion and will not be repeated here.
In urging this assignment of error, appellant states that he does not abandon his objection concerning property taken from the Charles Magouirk barn or the other property purportedly seized under the open fields doctrine. He then states that he will "address other collateral issues" without further elaboration on the items of evidence related to the Magouirk property or the open fields doctrine or the prejudice pertaining thereto. Clearly the bag and contents taken from the river were validly seized in accordance with the open fields doctrine. U.S. v. Dunn, 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987); Oliver v. U.S., 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984).
Because of the fashion of defendant's argument, we are unable to ascertain specifically which items he complains of with regard to the Charles Magouirk property. Frankly, we have been unable to determine if any of the items in evidence were actually seized from the Charles Magouirk property. Importantly, as we previously mentioned, defendant specifies no prejudice. This argument, then, is without merit.
We likewise suffer some confusion as to precisely what defendant's main point is regarding "collateral issues." He speaks of items of evidence "found after the first search" and also of items of evidence relating to the other burglary of the victim's residence on February 17, 1986. We have already discussed in some detail the circumstances regarding the evidence of the September 17 burglary and its admissibility, and we will not repeat that here.
Because defendant refers to "evidence found after the first search" and because his primary discussion under this assignment concerns the admissibility of physical evidence under the res gestae rule, we appreciate his argument to relate to evidence of the fact that a burglary apparently occurred at the victim's residence contemporaneously with the crime with which he was charged.
Title 15 provides the following with reference to the res gestae rule:
§ 447. Res gestae defined; admissibility
Res gestae are events speaking for themselves under the immediate pressure of the occurrence, through the instructive, impulsive and spontaneous words and acts of the participants, and not the words of the participants when narrating the events. What forms any part of the res gestae is always admissible in evidence.
§ 448. Relation of res gestae to criminal act
To constitute res gestae the circumstances and declarations must be necessary incidents of the criminal act, or immediate concomitants of it, or form in conjunction with it one continuous transaction.
The foregoing applies to statements and events associated with criminal acts sought to be proven. Thus, evidence related to and intertwined with the charged offense to such an extent that the State could not have reasonably presented its case without reference thereto is admissible. State v. Boyd, 359 So.2d 931, 942 (La.1978); State v. Clift, 339 So.2d 755, 760 (La.1976). Such evidence completes the story of the offense by demonstrating the context of events near in time and place. State v. Haarala, 398 So.2d 1093 (La.1981); State v. Johnson, 440 So.2d 838 (La.App. 2d Cir.1983); and State v. Broadway, 440 So.2d 828 (La.App. 2d Cir.1983).
The evidence of the burglary of the residence at about the time of the victim's disappearance is clearly part of the context of events related to the victim's demise. This assignment of error is without merit.

*64 CONCLUSION
Because we have determined that significant evidence admitted in the trial herein, the testimony of the witness Durbyn that the defendant confessed to killing the victim, should be excluded we do not consider the defendant's fifth assignment of error that the evidence was insufficient to convict him of manslaughter.
The case will therefore be remanded for a new trial consistent herewith on the offense of manslaughter. Since the defendant was previously convicted of manslaughter, he may not be retried for any greater offense. Green v. U.S., 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957).
CONVICTION REVERSED AND REMANDED FOR NEW TRIAL.
Before HALL, MARVIN, FRED W. JONES, SEXTON and LINDSAY, JJ.

ON REHEARING
SEXTON, Judge.
We granted a rehearing in this case to consider three issues raised by the State of Louisiana. These issues are: (1) whether the defendant waived his right of cross-examination by virtue of calling Durbyn as his own witness at the preliminary examination; (2) whether the failure to cross-examine Durbyn at trial amounted to a waiver of cross-examination concerning the inculpatory statement at the earlier preliminary examination; and (3) whether a remand is in order to allow the state to attempt to demonstrate that Durbyn refused to testify as a result of threats or other misconduct directed against him by the defendant, thereby resulting in a waiver of defendant's right to cross-examination.
The state's first two arguments were addressed in the original disposition of the case and we adhere to that opinion in those respects. Therefore, the only remaining issue on rehearing is the state's claim that we should remand the case to the district court for a hearing to allow the state to attempt to show that Durbyn refused to testify as a result of threats or other misconduct directed against him by Magouirk.
We have found no Louisiana jurisprudence addressing this issue. We have, however, located several federal cases addressing waiver by misconduct and rely on these cases for disposition of the issue.
U.S. v. Mastrangelo, 693 F.2d 269 (2d Cir.1982), cert. denied, 467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 343 (1984), involved the admissibility of grand jury testimony of a witness killed on his way to testify at a first trial setting. The trial court, based on the information before it, determined that the evidence was admissible but did not hold a specific hearing on the subject. The U.S. Second Circuit Court of Appeals determined that if the defendant was involved in the witness's death, he waived his right to confront the witnesses. However, since there was no hearing, the court remanded the case to the trial court in order that a hearing would be conducted on the issue. The court held that bare knowledge of a plot to kill the witness and a failure to warn appropriate authorities was sufficient to constitute a waiver. Further, the court found that the standard to be applied was a "preponderance of the evidence" but suggested that the trial court make findings under both the preponderance standard as well as a "clear and convincing" standard in order to expedite further proceedings.
In U.S. v. Thevis, 665 F.2d 616 (5th Cir. 1982), cert. denied, 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982), the Fifth Circuit held that a defendant who causes a witness to be unavailable for trial by preventing the witness from testifying waives his right to confrontation. Thevis involved a RICO prosecution involving murders and general gangsterism. One of the defendant's co-conspirators was a cooperating individual who testified before the grand jury but was murdered by the defendant. The trial court permitted the government to offer its evidence in order to establish that the defendant was responsible for the witness's death but held that the government had to establish by clear and convincing evidence that the defendant had in fact caused the witness's death in order to find that the defendant waived his right to confrontation.
*65 In U.S. v. Balano, 618 F.2d 624 (10th Cir.1979), cert. denied, 449 U.S. 840, 101 S.Ct. 118, 66 L.Ed.2d 47 (1980), the Tenth Circuit addressed a situation in which the defendant had coerced the witness into silence by threatening the witness's life. The court held that before permitting the admission of grand jury testimony of witnesses who will not appear at trial because of the defendant's alleged coercion, the judge must hold an evidentiary hearing in the absence of the jury and find by preponderance of the evidence that the defendant's coercion made the witness unavailable. In Balano, the trial court found after a hearing that the evidence supported a finding that the defendant had coerced the witness into not testifying, thus resulting in a waiver. See also, U.S. v. Rouco, 765 F.2d 983 (11th Cir.1985), cert. denied, 475 U.S. 1124, 106 S.Ct. 1646, 90 L.Ed.2d 190 (1986); U.S. v. Potamitis, 739 F.2d 784 (2d Cir.1984), cert. denied, 469 U.S. 934, 105 S.Ct. 332, 83 L.Ed.2d 269 (1984); U.S. v. Carlson, 547 F.2d 1346 (8th Cir.1976), cert. denied, 431 U.S. 914, 97 S.Ct. 2174, 53 L.Ed.2d 224 (1977).
In this case, the claim that the defendant waived his right to cross-examination by threats and/or misconduct has been raised for the first time in the rehearing application. Nevertheless, because of the lack of jurisprudence on the issue as well as its importance, we find that in the interest of fairness to the state, a remand to allow the trial court to conduct an evidentiary hearing and make a determination of whether the defendant waived his right to cross-examination is appropriate.
As we have determined that a remand is appropriate in this case, we next address the issue of the state's burden of proof in the waiver hearing. A review of the federal cases indicates discord among the circuits on the issue.[*] Nevertheless, we are more impressed with the disposition rendered by the U.S. Second Circuit Court of Appeals in U.S. v. Mastrangelo, supra. Mastrangelo adopts a preponderance of the evidence standard for proof of waiver by misconduct. We are in accord with the rationale there and adopt it as our own.
Upon remand, the trial court is directed to first explore the issue of whether the state knew or should have known at the time of trial of any of the evidence sought to be introduced at the remand. Should the trial court determine that the state was aware or should have been aware of the reason why Mr. Durbyn failed to testify and yet did not attempt to demonstrate the defendant's conduct, then a determination may be made that the state waived its right to address the waiver issue on remand.
If it is determined that the state did not waive its right to address the issue on remand, then the trial court is directed to address the issue of whether Durbyn's original testimony is "surrounded with sufficient particularized guarantees of trustworthiness." U.S. v. Mastrangelo, supra. Should trustworthiness be established, the next question to be addressed by the trial court is whether the defendant threatened or engaged in other misconduct designed to prevent Durbyn's testimony at trial. At the preliminary examination, there was information that the defendant had made general threats against anyone who divulged his inculpatory statement but these threats were not taken as serious by Durbyn at the preliminary examination as he proceeded to testify. Those threats are relevant and should be considered along with any other evidence that is presented.
However, the primary issue appears to be whether or not Durbin's silence was procured by other specific threats or specific misconduct by the defendant occurring after the preliminary examination. The trial judge is therefore directed to review all of the evidence presented that is relevant to the waiver issue and make a determination as to whether the state has demonstrated by a preponderance of the evidence *66 that the defendant waived his right of cross-examination.
Should the trial court determine that defendant's conduct was such as to amount to a waiver of cross-examination under the guidelines expressed here, then the court should rule to that effect, and the defendant's right to appeal that ruling is reserved. Should the court determine defendant's conduct did not amount to a waiver, then the trial court should order a new trial to be conducted consistent with our original opinion.
REMANDED FOR PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.
NOTES
[1] Both the State and the defendant sought writs from this court challenging the trial court ruling in this regard. [NO. 18,895-KW and 18,897-KW of January 22, 1987]. This court found the trial court's ruling "appeared to be correct and [did] not justify the exercise of this court's supervisory jurisdiction." Moreover, as to the defendant's challenge, the court found he had an adequate remedy on appeal. The Louisiana Supreme Court followed suit in denying writs on March 20, 1987 87-KK-0415 and 87-KK-0287.
[2] Defense counsel confesses to some confusion as to when these items were taken from the victim's house but maintains that if they were taken in the February 17 burglary they should not have been admitted. In the transcript of the Prieur hearing, Mrs. Frame identified these items as those taken from the Thomas home on February 17. This testimony is sufficient to connect the items with the burglary and as such will be addressed.
[3] The pertinent portion of the jury charge reads as follows:

The law permits in certain cases the State to offer evidence of similar acts, even though they may be separate and distinct crimes, but only for the purpose of showing system, guilty knowledge and intent, or for the purpose of showing the absence of an accident. These acts must be of a similar nature and indicative of a pattern or common course of conduct. They may be considered as a means of determining the knowledge, intent, or motive of the defendant and it might or might not aid the jury in determining the knowledge or intent of the defendant in the case at bar. However the law permits this testimony for that limited purpose and that purpose alone.
[*] As we noted earlier in this opinion, the U.S. Second Circuit Court of Appeals in U.S. v. Mastrangelo, supra, used a preponderance of the evidence standard. The Tenth Circuit followed this rationale in U.S. v. Balano, supra. In U.S. v. Thevis, supra, however, the Fifth Circuit chose to apply a clear and convincing standard.